# Exhibit A

CASE NO. 15-C-203                           OPENED  3/10/2015

JUDGE...    JUDGE ROBERT A. WATERS

     PLAINTIFF.  AMETHYST DAWN KIMBLE MOORE,TIMOTHY ALLEN MOORE, AMETHYST
VS DEFENDANT.  RICHARD A. FERGUSON,M.D. AND MESA OF TEAMHEALTH,INC., A

     PRO ATTY..  DAVID A. SIMS
     DEF ATTY..


PAGE#    DATE MEMORANDUM.............

00001  3/10/15 Comp fld; sums & 1 issd;rtn 20 days;sent to SWC to serve RG
00002  3/10/15   Ferguson:Sums &1 issd; rtn 30 days;sent by cert mail;rtn
00003  3/10/15   receipt;sums &1 issd; rtn 30 days; sent to SOS to serve
00004  3/10/15   Corp Service Co.
00005  3/16/15 Pltfs' Cert of Filing of First Combined Discovery Requests
00006  3/16/15    to Richard Ferguson MD
00007  3/18/15 Pltfs' Cert of Filing - First Combined Discovery
00008  3/23/15 Cert of filing - Video Depos
00009  3/20/15 Sums accepted by SOS for Corporation Service Co on 3-16-15
00010  3/20/15 Sums accepted by SOS for 21st Centry Insurance Co 3015015
00011  3/20/15 Cert mail card retd signed by Ashley Bain for MESA
00012  3/20/15   Team Health on 3-16-15
00013  3/25/15 Spa duc tec filed for CCMC
00014  3/30/15 Sums Compl retd exec IP on Richard Ferguson MD 3-27-15 -SWC

**CIVIL CASE INFORMATION STATEMENT**
**CIVIL CASES**

## IN THE CIRCUIT COURT OF WOOD COUNTY, WEST VIRGINIA

I.     CASE STYLE

Plaintiffs:

Amethyst Dawn Kimble,
Administratrix of the Estate of
Elijah Allen Moore,
Amethyst Dawn Kimble Moore,
and Timothy Allen Moore,

Civil Action No. 15-C-_203_
Judge _____

Defendants:                                    Service by:

Richard A. Ferguson, M.D.              Sheriff of Wood County
800 Garfield Avenue                       Personal Service
Parkersburg, WV 26101

MESA TeamHealth                           Circuit Clerk
Randal Dabbs, M.D., President        Certified Mail—Return Receipt
265 Brookview Centre Way, Suite 400   Requested
Knoxville, TN    37919

Corporation Service Company          Secretary of State
209 W. Washington Street
Charleston, WV    25302

II. TYPE OF CASE:      Medical Negligence
                                  Tort
                                  False Advertising
                                  Corporate Negligence
                                  Wrongful Death

III. SPECIAL NEEDS:    None by Plaintiffs

IV. JURY TRIAL: Yes, as demanded by Plaintiffs. Case will be ready for trial December of 2015.

| | |
|---|---|
| Attorney Name: | David A. Sims (Bar No. 5196) |
| Firm: | LAW OFFICES OF DAVID A. SIMS, PLLC |
| Address: | P.O. Box 5349, Vienna, WV 26241 |
| Telephone: | (304) 428-5291 |
| Dated: | March 10, 2015 |
| Counsel for: | Plaintiffs |

David A. Sims
david.sims@mywvlawyer.com

FILED IN OFFICE
MAR 10 2015
CAROLE JONES
CLERK CIRCUIT COURT

## IN THE CIRCUIT COURT OF WOOD COUNTY, WEST VIRGINIA

Amethyst Dawn Kimble Moore,
Timothy Allen Moore,
Amethyst Dawn Kimble,
Administratrix of the Estate of
Elijah Allen Moore,

     Plaintiffs,

     v.                            Civil Action No. 15-C-_203_
                                      Judge _____

Richard A. Ferguson, M.D.
And MESA of TeamHealth, Inc.,
A foreign corporation,

     Defendants.

### COMPLAINT FOR DAMAGES

Now Come Amethyst Dawn Kimble Moore, Timothy Allen Moore, and

Amethyst Dawn Kimble, Administratrix of the Estate of Elijah Allen Moore by

and through their counsel David A. Sims and LAW OFFICES OF DAVID A. SIMS, PLLC

and do hereby complain to this Honorable Court against Defendant Richard A.

Ferguson and MESA TeamHealth, M.D. as follows:

### BACKGROUND INFORMATION:

1.    Amethyst Dawn Kimble Moore and Timothy Allen Moore are the

    natural parents of Elijah Allen Moore.

FILED IN OFFICE

MAR 1 0 2015

1

CAROLE JONES
CLERK CIRCUIT COURT

2.    At the time of the birth of Elijah Allen Moore on February 14, 2014, Amethyst Dawn Kimble and Timothy Allen Moore were not married, but they have since married and Amethyst Dawn Kimble has assumed the name of Amethyst Dawn Moore.

3.    Prior to the birth of Elijah Allen Moore, his expectant mother Amethyst Dawn Kimble told her obstetrics physician that she suffered from a genetic condition in that her father suffered from Hemophilia.

4.    The note is in the chart of Amethyst Dawn Kimble on July 23, 2013, which was the date of her first visit to see him.

5.    The obstetrician signed off on the note "EL" when he reviewed it with the patient, acknowledging that he was aware of Amethyst's father's hemophilia.

6.    Once the child's sex was known, prior to December 18, 2013, some 56 days prior to the birth of Elijah Allen Moore, the obstetrician requested information from Amethyst Dawn Kimble's Pediatrician about her hemophilia history.

7.    The obstetrician was told that Amethyst's brother suffered from hemophilia and that meant that Amethyst had a 50/50 chance of

2

being a carrier of hemophilia, but that she had never been tested for it.

8. The information that was provided by her pediatrician was wrong, as it was her father who suffered from hemophilia.

9. Amethyst Dawn Kimble gave birth to Elijah Allen Moore on February 14, 2014.

10. Elijah Allen Moore underwent a traumatic birth, including vacuum assisted delivery, and the use of scalp placed monitors, neither of which a baby who is suspected to be a hemophilia affected baby is allowed to have.

11. In the nursing notes from February 14-17, the time Elijah Allen Moore and his mother were patients at a local hospital, the bruising and growing contusion on Elijah Allen Moore's head were properly documented.

12. In the nursing notes from February 14-17, it is also documented that Elijah Allen Moore's bilirubin had gone down slightly, but based upon the time he was on the bili-blanket, it should have improved significantly.

3

13.   Despite the signs and symptoms of an internally bleeding child, the discharge papers were signed on Monday, February 17, 2014.

14.   The discharge instructions were to bring Elijah Allen Moore to the bilirubin clinic at 8:00 a.m. on Wednesday, February 19, 2014 and to see the pediatrician on the same date.

15.   When Elijah Allen Moore arrived at the bilirubin clinic, Amethyst Dawn Kimble reported that the baby was not feeding well; that he was restless; and he was not acting right.

16.   The bilirubin clinic nurse's document lethargy, significantly bruising, and climbing bilirubin level, which are signs and symptoms of a child who is suffering from internal bleeding.

17.   As instructed, Amethyst Dawn Kimble arrives at the pediatrician's office for Elijah Allen Moore's first visit.

18.   The pediatrician examined the child, finds him to be in good health, and explains to Amethyst Dawn Kimble and Timothy Allen Moore how well their son is doing.

19.   The Progress Note reports a well-child.

20. The Progress Note also reports that Elijah Allen Moore had an appointment with the Hemophilia Clinic at CAMC Memorial Division at 1:00 p.m. the next day.

21. The West Virginia Department of Health and Human Resources Early and Periodic, Screening, Diagnosis and Treatment Health Check Program Preventive Health Screen states that the child's head, neurological, and seventeen results of Defendant Ferguson's examination were all within normal limits.

22. The pediatrician's chart also reveals that he was sent the test results that his patient had Factor VIII deficiency at 9:01 a.m. on February 19, 2014, which he shared with Amethyst Dawn Kimble or Timothy Allen Moore during Elijah Allen Moore's appointment.

23. At approximately 2:38 p.m., on February 19, 2014, Amethyst Dawn Kimble and Timothy Allen Moore arrived at the Emergency Department at a local hospital because he had two episodes that they believed were seizures and they rushed him there for care and treatment.

24. The Emergency Department physician on duty and who was assigned to provide care to Elijah Allen Moore was Richard A. Ferguson, M.D.

25. Richard A. Ferguson, M.D. is a medical doctor and he received his training from Michigan State University College of Human Medicine graduating in 2004.

26. Richard A. Ferguson, M.D. completed his post-graduate training at University of Utah School of Medicine in September of 2012, just one year and six months before he was providing care and treatment to patients like Elijah Allen Moore.

27. Richard A. Ferguson, M.D. became Board Certified in Family Practice Medicine, General, by the American Board of Family Medicine on September 24, 2012.

28. As noted by the American Board of Family Medicine, "board certification demonstrates a physician's exceptional expertise in a particular specialty and/or subspecialty of medical practice. Certification by an ABMS Member Board involves a rigorous process of testing and peer evaluation that is designed and administered by specialists in the specific area of medicine. If your doctor is certified by an ABMS Member Board, it means he or she is dedicated to providing exceptional patient care through a rigorous, voluntary commitment to lifelong learning through board certification and

6

ABMS Maintenance of Certification (MOC). In addition to completing years of schooling, fulfilling residency requirements and passing the exams required to practice medicine in your state, your board certified specialist participates in an ongoing process of continuing education to keep current with the latest advances in medical science and technology in his or her specialty as well as best practices in patient safety, quality healthcare and creating a responsive patient-focused environment."

29.   On the date of Elijah Allen Moore's admission, Richard A. Ferguson, M.D. was Board Certified, not in Emergency Medicine, but in General Family Practice Medicine.

30.   There was no mention by Dr. Ferguson or any other person on his medical team that he was not Board Certified in Emergency Medicine nor that he was not an Emergency Medicine trained physician.

31.   Because of his education, training and experience, Dr. Ferguson is not even board eligible by the American Academy of Emergency Physicians because he lacks the training and qualifications for that certification.

32. In accordance with the Medical Professional Liability Act, §55-7B-1, et seq. the Legislature found that "the citizens of this state are entitled to the best medical care and facilities available..." The Legislature also found that "as in every human endeavor the possibility of injury or death from negligent conduct commands that protection of the public served by health care providers be recognized as an important state interest."

33. Elijah Allen Moore was entitled, by statute, to the best medical care and facilities available.

34. On February 19, 2014, Elijah Allen Moore did not receive the best medical care available, due in part, because Richard A. Ferguson, M.D. was not an Emergency Medicine trained physician.

35. At 2:34, Ms. Kimble and Mr. Timothy Moore brought their son Elijah Allen Moore to a local emergency medicine department based in part because of advertising that MESA TeamHealth participated in touting the medical qualifications of its Emergency Medicine physicians. Elijah Allen Moore did not receive the type of medical treatment the advertisers had suggested he would.

8

36. There is no nursing documentation of Elijah's chief complaint or history of present illness. The nurses were under the direct supervision and control of Richard A. Ferguson, M.D. and MESA TeamHealth.

37. The nursing notes at 3:10 describe a heart rate of 60-100 per minute, a temperature of 98.6F, respiratory rate of 40 per min, and pulse oximetry of 100%. Weight was 7.8 lbs/3.5 kg. There was noted bruising of both his hands and feet, the right eye and the left antecubital region. He was visibly jaundiced. He was obtunded and only made a small whimper when an IV was placed. Capillary blood glucose was 105 mg/dl.

38. For forty minutes, precious time was lost because Elijah Allen Moore was sitting in the waiting room with his parents because the Emergency Medicine department, operated by MESA TeamHealth was understaffed by physicians to provide the care he needed.

39. At 4:44 p.m., the results of laboratory testing (drawn at 4:33 p.m.) were received. The white blood count was 12, the hemoglobin was 7.2, the hematocrit was 20.3, and the platelet count was 144, all of

which indicated that this child's condition needed immediate attention.

40. Dr. Ferguson finally saw the patient starting at about 5:15 p.m. as documented on the "T-Sheet". The history was of a 5 day old male with known Factor VIII deficiency, who had not been acting right, having seizure activity, and was eating less, because of an absence of sucking activity. There was no history of fever.

41. Dr. Ferguson's documented physical exam is of a well appearing neonate with a normal exam with the exception of poor oral intake/sucking activity, and mild right eye deviation. The anterior fontanel was described as not bulging. In his dictated report, he describes a soft cephalohematoma that became more firm during the ED course. He does not mention the bruising noted and documented by the nursing staff under his direction.

42. Dr. Ferguson's note from 5:15 p.m. indicates that Elijah Allen Moore looked well and had a normal examination. Dr. Ferguson did not order Factor VIII upon admission, nor did order a stat CT. He did not order anything but blood work that was abnormal, but he did not do anything about it until much later in the evening.

43. Dr. Ferguson did not know to order Factor VIII medicine or a stat CT scan because he was not properly trained in Emergency Medicine nor was he properly trained by his employer MESA TeamHealth in recognizing intracranial bleeds in neonates suffering from traumatic births, while being severely Factor VIII deficient, and the risks posed by them.

44. Dr. Ferguson lacked the knowledge of an Emergency Department physician when he was faced with an infant suffering from hemophilia. But, Dr. Ferguson could have gained all of the knowledge he needed by utilizing his smart phone. Had he merely Googled hemophilia treatment for neonates with significant bruising, he would have learned that he needed to administer Factor VIII and order a stat CT scan and transfer the child's care to a Hemophilia Treatment Center.

45. For reasons that are not documented in the record, Dr. Ferguson called the infant's pediatrician at 5:50 p.m. If the child was well and was not having any problems, as Dr. Ferguson describes, there was no need for him to call his pediatrician.

46. At 6:46, the patient was observed by a nurse to arch his back and have stiffness of his arms. His eyes drifted off to the left. Heart rate was 181 beats per minute, respiratory rate was 42 per minute, and oxygen saturation was down to 87%.

47. Dr. Ferguson was notified by his nursing staff of this sudden change in the infant's condition, but still did not order that Factor VIII be administered or a stat CT scan to determine what was happening to his patient who had just suffered a traumatic birth, with vacuum assisted delivery, who had a decreasing blood count.

48. Had Dr. Ferguson done a search on his smart phone, he would have found that vacuum assisted deliveries cause brain bleeds in 1/3 of the patients who suffer from hemophilia.

49. Dr. Ferguson again calls the child's pediatrician for him to come to the Emergency Department, presumably for a consultation.

50. At 7:23 p.m., the infant's pediatrician arrived in the ED and after a discussion, at 7:34 p.m., Dr. Ferguson requested a transfer to Ruby Memorial Hospital by aeromedical transport, which should have been done immediately after the stat CT upon completion of the

Factor VIII administration, which should have been done upon
admission to the Emergency Department.

51.  The pediatrician knew that West Virginia has two Hemophilia
     Treatment Centers (HTCs), one at Charleston Area Medical Center
     and one at West Virginia University Hospitals, both of which are
     funded by the Centers for Disease Control.

52.  The pediatrician knew that the HTC's are specifically equipped with
     specialty physicians, medications, laboratory equipment and
     therapists to avoid disasters like the one that happened to Amethyst
     Dawn Kimble Moore, Timothy Allen Moore, and Elijah Allen Moore.

53.  The child's pediatrician insisted that Richard A. Ferguson, M.D.
     transfer the child to one of them.

54.  According to the pediatrician's note from the Emergency
     Department, there was a small hematoma at delivery that was
     unchanged on the office visit earlier in the day, which indicates that
     the bleeding on the child's brain began after he left the physician's
     office.

55.  The pediatrician now describes the cephalohematoma as now being
     tense and hard. He also relates that the patient appeared in shock

13

and was administered a 40 cc/kg bolus of normal saline with improvement in his condition.

56. The pediatrician states in his note that he considered administering Factor VIII, but that by then the transport team arrived and assumed care of the patient.

57. At 7:45 p.m., Dr. Ferguson finally ordered a (CT) scan of the head.

58. A repeat hemoglobin and hematocrit were ordered and reported as 6.4 and 18.4 respectively.

59. At 8:48 p.m., a transfusion of O negative blood was started.

60. The CT scan was finally performed at 9:08 p.m., which revealed a brain bleed that any competent Emergency Medicine physician would have recognized when Elijah Allen Moore came to the Emergency Department.

61. The CT scan was read at 9:21 p.m. and the radiologist reported a mildly displaced oblique fracture of the right occipital bone. There was a large right intraparenchymal occipital/parietal hemorrhage, with extensive edema throughout the right cerebral hemisphere with pressure on the right lateral ventricle, moderate right to left midline shift, diffuse loss of gray-white differentiation and effacement of the

cerebral sulci, with apparent impending downward and transtentorial herniation. There were also bilateral posterior and right tentorial subdural hematomas, and some diastasis of the sutures.

62. For seven hours, this infant was in the Emergency Room and nothing was being done for the first five hours he was there.

63. Richard A. Ferguson, M.D. failed to recognize the importance of the information that was presented to him: Elijah had undergone a traumatic vacuum-assisted delivery at the same facility on February 14, 2014; he was severely Factor VIII deficient; he had a large cephalohematoma, and significant bruising elsewhere. He was lethargic and was not eating well, and had lost the desire or ability to attach to his mother's breast for feeding. He had suffered seizures both prior to arrival and in the emergency department. His condition demanded immediate action on the part of Dr. Ferguson and was worsening in the emergency department, but Dr. Ferguson did not recognize it until it was too late for this child.

64. Dr. Ferguson should have rapidly evaluated this child for causes of lethargy, seizures, and bruising. Given his known history of traumatic

15

birth and untreated Hemophilia A, intracranial hemorrhage should have been at the very top of the list of differential diagnosis. An emergency CT scan of the head was indicated. Instead, he waited two and one half hours from the time of his initial examination before ordering this scan, which ultimately did show intracranial bleeding and secondary brain injuries, but was not ordered stat so there was additional delay causing this child additional brain damage, while he lay in the ED.

65. Administration of treatment for Factor VIII deficiency (purified or recombinant Factor VIII or cryoprecipitate) was urgently required, as was transfer to a Hemophilia Treatment Center with a neonatal intensive care unit. Instead he waited two and a quarter hours from the time of his initial examination until ordering the transfer and five and a quarter hours until the administration of Factor VIII.

66. Elijah Moore's initial hemoglobin was severely decreased at 7.2. This result from the initial blood tests indicated bleeding that was severe enough to result in hemorrhagic shock and was further evidence of intracranial bleeding.

16

67. An immediate transfusion of blood was indicated as soon as the results became available. Instead blood was not transfused until four hours later, after a repeat hemoglobin returned as even lower at 6.4.

68. Dr. Ferguson's demonstrated lack of forethought was reflected in the fact that type O negative blood had to be used for emergency transfusion long after the need for transfusion was apparent.

69. Type-specific blood could not be used because Dr. Ferguson had not ordered Elijah's blood to be typed and cross-matched in anticipation of the need for a possible blood transfusion.

70. Anticonvulsant medication to prevent seizures should have been administered early, ideally before the seizure that occurred in the emergency department. Instead, Cerebyx was not ordered until five hours after Elijah was seen by Dr. Ferguson; this was three and a half hours after his first witnessed seizure in the emergency department, again causing additional damage to this child's brain.

71. Intubation and mechanical ventilation were indicated to protect Elijah's airway, and to maintain ventilation and oxygenation, so as to minimize secondary brain injury.

72. Intubation and mechanical ventilation were not done until the transport team arrived and witnessed him to be having recurrent seizures and periods of apnea, four and one half hours after Dr. Ferguson's initial examination.

73. Dr. Ferguson missed the opportunities to make an earlier diagnosis of and arrest the intracranial bleeding and secondary brain injury that was occurring because he did not know what to do. The neonate looked fine to him, so he just did nothing but monitor this baby to the detriment of his patient.

74. Elijah Allen Moore needed additional treatment before he could be transported to WVU Hospital for further evaluation and treatment.

75. After many prayers and upon the advice of every doctor who saw Elijah Moore from February 24, 2014 forward, on March 3, 2014, Amethyst Dawn Kimble and Timothy Allen Moore made a difficult decision to remove their son from life-support as there was no chance that he was going to recover from the brain bleed he sustained prior to his transfer to WVU Hospitals.

**JURISDICTION AND VENUE:**

76.   All of the allegations contained in paragraphs 1-75 are restated herein.

77.   Amethyst Dawn Moore is a resident of Wood County, West Virginia.

78.   Timothy Allen Moore is a resident of Wood County, West Virginia.

79.   Estate of Elijah Allen Moore was created in Wood County, West Virginia.

80.   The breaches of the standard of care by Richard A. Ferguson, M.D. all took place in Wood County, West Virginia.

81.   Richard A. Ferguson, M.D. upon information and belief is a resident of Wood County, West Virginia.

82.   Richard A. Ferguson, M.D.'s principal place of work is located in Wood County, West Virginia.

83.   MESA TeamHealth entered into a contract with a local hospital to provide coverage for, operate, manage, and control the Emergency Department at its facility.

84.   MESA TeamHealth has an office in Wood County, West Virginia where it conducts business.

85. The amount in controversy meets the jurisdictional limits of the Circuit Court of Wood County, West Virginia.

86. The Circuit Court of Wood County, West Virginia has jurisdiction of the parties and venue is proper in this county.

### COUNT ONE: STANDARDS OF CARE FOR EMERGENCY DEPARTMENT PHYSICIANS:

87. All of the allegations contained in paragraphs 1-86 are restated herein.

88. The standard of care required that Defendant Ferguson recognize that Elijah Allen Moore was a hemophiliac as it was already a part of his medical chart at the local hospital.

89. The standard of care required Defendant Ferguson to look at his patient's chart, which would have demonstrated that he was severely Factor VIII deficient.

90. The standard of care required Defendant Ferguson to recognize that Elijah Allen Moore was suffering from effects of hemophilia when he entered the Emergency Department at the local hospital.

91. The standard of care required Defendant Ferguson to properly assess his patient to determine what care and services Elijah Allen Moore needed on a stat basis, not as his schedule permitted.

20

92. The standard of care required Defendant Ferguson to recognize what care and treatment Elijah Allen Moore required upon his arrival at the Emergency Department.

93. The standard of care required that Defendant Ferguson administer Factor VIII to Elijah Moore upon arrival, based upon his history and blood count.

94. The standard of care required that Defendant Ferguson order a stat CT based upon Elijah Moore's history and the bruising he had.

95. The standard of care required that Defendant Ferguson order an immediate transfer to a Hemophilia Treatment Center once the CT results returned positive for a bleed on the brain.

96. The standard of care required Defendant Ferguson to have experience in managing hemophilia affected infants.

97. The standard of care required Defendant Ferguson to recognize that the facility he was operating the Emergency Department lacked the laboratory facilities, medications and specialists to handle this child's care.

98. The standard of care required Defendant Ferguson to transfer Elijah Allen Moore to a facility with substantial experience in hemophilia

21

and access to both laboratory monitoring and appropriate factor replacement therapy, like one of the two HTCs in West Virginia.

99. The standard of care required Dr. Ferguson to recognize he lacked sufficient knowledge to provide proper medical care to this child.

100. The standard of care required Defendant Ferguson on February 19, 2014 to advise his patient's parents, Amethyst Dawn Kimble and Timothy Allen Moore, that their son needed care that he was not able to provide so that they could make an informed choice about the care their son was to receive.

101. The standard of care required Defendant Ferguson to advise the patient's parents that based upon the traumatic delivery that he had just undergone, including the use of vacuum assisted delivery, tripled the chances that their son would have a CNS bleed, so that they could make an informed choice about the care their son was to receive.

102. The standard of care required Defendant Ferguson to advise his patient's parents of the treatment options that existed at that time to properly care for and treat him so that they could make an informed choice about the care and treatment of their son.

22

## COUNT TWO: DR. FERGUSON'S BREACHES OF THE STANDARD OF CARE:

103. All of the allegations contained in paragraphs 1-102 are restated herein.

104. Defendant Ferguson breached the standard of care when he failed to recognize that Elijah Allen Moore was a hemophiliac.

105. Defendant Ferguson breached the standard of care when he failed to look at his patient's chart, which would have demonstrated that he was severely Factor VIII deficient.

106. Defendant Ferguson breached the standard of care when he failed to recognize that Elijah Allen Moore was suffering from effects of hemophilia, including a possible CNS bleed.

107. Defendant Ferguson breached the standard of care when he failed to properly assess his patient to determine what care and services Elijah Allen Moore needed on an emergent basis.

108. Defendant Ferguson breached the standard of care when he failed to administer Factor VIII to Elijah Moore upon arrival, based upon his history and blood count.

23

109. Defendant Ferguson breached the standard of care when he failed to order a stat CT based upon Elijah Moore's history and the bruising he had.

110. Defendant Ferguson breached the standard of care when he failed to order an immediate transfer to a Hemophilia Treatment Center once the CT results returned positive for a CNS bleed.

111. Defendant Ferguson breached the standard of care when he failed to have experience in managing hemophilia affected infants.

112. Defendant Ferguson breached the standard of care when he failed to recognize that the facility he was operating the Emergency Department lacked the laboratory facilities, medications and specialists to handle this child's care.

113. Defendant Ferguson breached the standard of care when he failed to transfer Elijah Allen Moore to a facility with substantial experience in hemophilia and access to both laboratory monitoring and appropriate Factor VIII replacement therapy, like one of the two HTCs in West Virginia.

114. Defendant Ferguson breached the standard of care when he failed to recognize he lacked sufficient knowledge to provide proper medical care to his patient.

115. Defendant Ferguson breached the standard of care when he failed to advise his patient's parents, Amethyst Dawn Kimble and Timothy Allen Moore, that their son needed care that he was not able to provide so that they could make an informed choice about the care their son was to receive.

116. Defendant Ferguson breached the standard of care when he failed to advise the patient's parents that based upon the traumatic delivery that he had just undergone, including the use of vacuum assisted delivery, tripled the chances that their son would have a CNS bleed, so that they could make an informed choice about the care their son was to receive.

117. Defendant Ferguson breached the standard of care when he failed to advise his patient's parents of the treatment options that existed at that time of his arrival at the ED to properly care for and treat him so that they could make an informed choice about the care and treatment of their son.

25

118. Defendant Ferguson breached the standard of care when he failed to advise them that these HTCs existed or that their son Elijah Allen Moore would have better care and treatment had his care been transferred to one of the two facilities in this state.

119. Defendant Ferguson breached the standard of care when he failed to advise Elijah's parents that there was a likelihood of a better treatment outcome with earlier care at an HTC.

120. Defendant Ferguson breached the standard of care set forth in the State Trauma and Emergency Care System Emergency Health Care Procedures for Designated Trauma Centers in his care and treatment of Elijah Allen Moore.

### COUNT THREE: DR. FERGUSON'S BREACHES OF THE STANDARD OF CARE WERE A PROXIMATE CAUSE OF PLAINTIFFS' INJURIES AND DAMAGES:

121. All of the allegations contained in paragraphs 1-120 are restated herein.

122. Defendant Ferguson's breaches of the standard of care were a proximate cause of the following injuries and damages:

   a. Negligently inflicted pain, suffering and emotional distress on Amethyst Dawn Moore, while her son was alive;

b. Negligently inflicted pain, suffering and emotional distress upon Timothy Allen Moore, while his son was alive;

c. Negligently inflicted pain, suffering and emotional distress on Elijah Allen Moore;

d. Negligently caused an increase in the amount of the damage done to Elijah Allen Moore's brain; and,

e. Negligently caused the death of Elijah Allen Moore, thus making him liable for all the damages recoverable under the wrongful death statute.

123. West Virginia Code § 55-7B-1 provides that Plaintiffs are entitled to recover damages:

> That as in every human endeavor the possibility of injury or death from negligent conduct commands that protection of the public served by health care providers be recognized as an important state interest. That our system of litigation is an essential component of this state's interest in providing adequate and reasonable compensation to those persons who suffer from injury or death as a result of professional negligence, and any limitation placed on this system must be balanced with and considerate of the need to fairly compensate patients who have been injured as a result of negligent and incompetent acts by health care providers...

27

124. Defendant Ferguson's breaches of the standard of care resulted in costs of the care and treatment of Elijah Allen Moore to exceed Three Hundred Twenty Six Thousand Dollars ($326,000.00).

125. Defendant Ferguson's breaches of the standard of care resulted in the loss of the society, companionship and kindly offices of Elijah Allen Moore for the rest of Amethyst Dawn Moore and Timothy Allen Moore's natural lives.

126. Defendant Ferguson's breaches of the standard of care resulted in the loss of earning capacity of Elijah Allen Moore that the Estate of Elijah Allen Moore is entitled to recover in an amount in excess of Two Million Dollars ($2,600,000.00).

127. Defendant Ferguson's breaches of the standard of care resulted in the incurring of expenses to the Estate of Elijah Allen Moore for his burial and headstone in an amount in excess of One Thousand Three Hundred Dollars ($1,300.00), which Plaintiffs were forced to pay for over-time as they lacked the funds to pay for it in total at the time of his death.

128. The breaches of the standard of care in set forth in the State Trauma and Emergency Care System Emergency Health Care Procedures for

28

Designated Trauma Centers in his care and treatment of Elijah Allen Moore render the "trauma cap" in applicable to this cause of action and permits Plaintiffs to recover all damages available to them, subject to the other caps contained within the statute.

## COUNT FOUR: GROSS NEGLIGENCE OF RICHARD A. FERGUSON, M.D.:

129. All of the allegations contained in paragraphs 1-128 are restated herein.

130. Defendant Ferguson's breaches of the standard of care, at every instance, were grossly negligent.

131. Gross negligence involves a reckless disregard for the safety of others.

132. The timeline for the lack of care provided by Defendant Ferguson demonstrates a complete disregard for the safety of Elijah Allen Moore.

133. Had Dr. Ferguson acted with some regard for the safety of Elijah Allen Moore, Dr. Ferguson could have searched on his smart phone and discovered everything he needed to know in order to save this child's life from the Internet.

134. Had he acted with some regard for the safety of Elijah Allen Moore, Dr. Ferguson could have researched Elijah Moore's condition and found out exactly what he needed to do to save this child's life from one of the many computers available to him in the hospital to save this child's life from the Internet.

135. The Medical Professional Liability Act permits an award of punitive damages against a grossly negligent defendant like Defendant Ferguson.

136. The amount of punitive damages is not subject to any cap imposed by the Medical Professional Liability Act.

### COUNT FIVE: FALSE ADVERTISING BY MESA TEAMHEALTH:

137. All of the allegations contained in paragraphs 1-132 are restated herein.

138. MESA TeamHealth was the contracted operator of the emergency department at the local hospital on February 19, 2014.

139. The local hospital and MESA TeamHealth entered into a written agreement wherein the policies and procedures to be followed in the Emergency Department were to be developed by MESA TeamHealth,

including staffing needs, physician providers, medical guidelines and protocols, along with the general operation of the department.

140. MESA TeamHealth has its own office in the emergency department with its name prominently displayed on the door.

141. MESA TeamHealth contract was to provide competent emergency department physicians, who were credentialed by TeamHealth and submitted to the local hospital's Board for approval.

142. MESA TeamHealth touts the rigorous evaluation of physicians it undertakes prior placing the physician in the ED of one of its contracted facilities.

143. MESA TeamHealth and the local hospital also agreed to jointly advertise its Emergency Department as the best in the region to encourage people like Amethyst Dawn Moore and Timothy Allen Moore to bring their loved ones there for care and treatment.

144. MESA TeamHealth recognized with the creation of an Emergency Department in Belpre, Ohio, it would jeopardize the number of patients its members would see at the local hospital.

145. A reduction of the number of patients seen by its staff means the loss of profits to MESA TeamHealth.

146. MESA TeamHealth benefited from advertising because it brought patients to the hospital for emergency medical care, and thereafter billed those patients for the services its providers provided.

147. MESA TeamHealth also benefited by maintaining its market share in being able to advertise it had other ancillary services that the stand alone ED in Belpre, Ohio did not have.

148. The advertising agreement between MESA TeamHealth and the local hospital benefited MESA TeamHealth's providers who receive additional compensation based upon the number of patients they see during their shift.

149. The agreement between the two resulted in corporate profits for MESA TeamHealth as a for-profit provider of emergency medical services.

150. The agreement failed to consider the health and well-being of patients like Elijah Allen Moore.

151. As a direct and proximate result of the false advertising committed by Defendant TeamHealth, Plaintiffs suffered the injuries and damages complained of herein.

152. As a direct and proximate result of the false advertising, Plaintiffs are entitled to an award of punitive damages against MESA TeamHealth for such advertising and the injuries caused by the same.

**COUNT SIX: MESA TEAMHEALTH INTENTIONALLY MISREPRESENTED ITS PHYSICIANS TO THE PLAINTIFFS:**

153. Plaintiffs re-allege all previous allegations.

154. MESA TeamHealth, with its profit motive in mind, contracted or hired physicians to work at the local hospital's emergency department who were untrained, unqualified and ill-prepared to deal with persons who truly needed care from an Emergency Medicine trained physician.

155. The first four persons under the listing for Emergency Medicine physicians show no record of being licensed to practice in the State of West Virginia.

156. The fifth physician listed got his license to practice medicine in West Virginia in 2013, but has on record two medical malpractice cases where money was paid out for his negligence in the care and treatment of his patients and the records do not reveal any board certification of any kind for him.

157. The sixth physician listed got his license to practice medicine in West Virginia in 2012, but the records do not reflect that he is board certified in any field of medicine.

158. The seventh physician listed got his license to practice medicine in West Virginia in 2012, and he is Board Certified in Emergency Medicine by the ABMS, but not the Academy of Emergency Medicine Physicians, which the true benchmark of being specialty trained in Emergency Medicine. And, he has had three medical malpractice claims against him prior to coming to West Virginia which were paid by his insurance carriers. His location, according to the West Virginia Board of Medicine, is at Bluefield Regional Medical Center, not the local hospital where Elijah Moore was taken.

159. The ninth physician received his license to practice medicine in 2013 and is Board Certified by ABMS in General Family Practice, and not the true certifying body called the American Board of Family Medicine.

160. The tenth physician received his license to practice medicine in 2009. He is Board Certified by ABMS in Preventative Medicine.

161. The eleventh physician received his license in 2001. He is location is Grant Memorial Hospital in Petersburg, West Virginia, which is not the local hospital referenced in this Complaint. He is Board Certified in Emergency Medicine by ABMS and not by the true Board called the Academy of Emergency Medicine Physicians.

162. The twelfth physician received her license to practice medicine in 2011. She received her post-graduate training at the local hospital mentioned herein. She lists her medical specialty in Internal Medicine. She is not listed anywhere as being board certified in any specialty by any board.

163. The thirteenth physician received his license to practice medicine in 2009. He reports his primary place of business in Huntington, West Virginia. He is Board Certified in Internal Medicine by ABMS and not by the true Board called the American College of Physicians Internal Medicine board certification.

164. The fourteenth physician listed received her license to practice medicine in 1994. She lists her primary practice location in Sistersville, West Virginia. She is Board Certified in Internal Medicine

35

by ABMS and not by the true Board called the American College of

Physicians Internal Medicine board certification.

165. The fifteenth physician listed received his license to practice

medicine in 2005. He is Board Certified in Emergency Medicine by

ABMS and not by the true Board called the Academy of Emergency

Medicine Physicians.

166. The sixteenth physician listed received his license to practice

medicine in 1998. He lists his primary location at Marietta Memorial

Hospital. He is not listed anywhere as being board certified in any

specialty by any board.

167. The seventeenth physician listed received his license to practice

medicine in 1996. He lists his primary location at Marietta Memorial

Hospital. He is not listed anywhere as being board certified in any

specialty by any board. He has had one malpractice claim resulting in

a payment to a patient for his negligence.

168. The eighteenth physician listed received his license to practice

medicine in 1998. He is Board Certified in Emergency Medicine by

ABMS and not by the true Board called the Academy of Emergency

Medicine Physicians. He has had one malpractice claim resulting in a

payment to a patient for his negligence. He has been licensed in AZ, CT, DE, FL, GA, MI, NC, NY, OH, PA, SC, VA, and WV.

169. The nineteenth physician received his license to practice medicine in 2011. He is Board Certified in Emergency Medicine by ABMS and not by the true certifying Board called the Academy of Emergency Medicine Physicians. In 2014, he was reprimanded by the WV Board of Medicine for underage drinking at his house and ordered to pay a fine, after he plead no contest to those charges in Wood County.

170. The twentieth physician listed received his license to practice medicine in 1979. He is Board Certified in Emergency Medicine by ABMS and not by the true certifying Board called the Academy of Emergency Medicine Physicians. He has had six malpractice claims resulting in payments to a patients for his negligence.

171. The twenty first physician listed received his license to practice medicine in 2010. He is Board Certified in Internal Medicine by ABMS, but not the true certifying board called the American College of Physicians Internal Medicine board certification.

172. The twenty second physician listed received his license to practice medicine in 1998. He is Board Certified in Emergency Medicine by

ABMS and not by the true certifying Board called the Academy of

Emergency Medicine Physicians. He has had at least two run-ins with

the West Virginia Board of Medicine for drug addiction and lying on

his application for a license to practice medicine in the State of West

Virginia. He has had one malpractice claim made against him which

resulted in payment to a victim of his medical negligence.

173. The twenty third physician listed received his license to practice

medicine in 1979. He is not listed as being board certified in any

medical specialty by the licensing boards. He has four malpractice

claims made against him wherein money was paid to victims of his

medical negligence.

174. The twenty fourth physician listed received his license to practice

medicine in 1997. He is Board Certified in Emergency Medicine by

ABMS and not by the true certifying Board called the Academy of

Emergency Medicine Physicians. He has had one malpractice

complaint filed against him which resulted in a payment to a victim

of his medical negligence.

175. The reason why MESA TeamHealth does not hire or contract with

physicians certified in Emergency Medicine by the Academy of

Emergency Medicine Physicians is that those physicians must have completed residency training in Emergency Medicine and passed the rigorous board examinations set forth by that organization, including oral and written examinations, in Emergency Medicine. Physicians with this specialization and certification demand and receive higher levels of compensation than those approved by ABMS, which does not require specific residency training in Emergency Medicine and does little testing of its membership, yet it certifies them in Emergency Medicine, which is deceiving to the general public.

176. Defendant MESA-TeamHealth has routinely touted the qualifications of the physicians in its Emergency Department in newspaper and other advertising materials to be seen by Plaintiffs and the public at large.

177. Instead of honestly describing the qualifications of Emergency Department physicians, it was cheaper for TeamHealth to staff its facility with family practice and other physicians rather than to staff them with physicians with who have undergone residency training in Emergency Medicine and are certified by the American College of Emergency Medicine Physicians.

178. Rather than pay for properly trained physicians, MESA TeamHealth has chosen to employ physicians that are not properly trained in Emergency Medicine, but claims that each of the physicians in its Emergency Department have a "Specialty in Emergency Medicine", which is just false.

179. Amethyst Dawn Moore and Timothy Allen Moore expected that their child, Elijah Allen Moore, would be treated by Emergency Medicine physicians, not family practice physicians.

180. As a direct and proximate result of the misrepresentation of the qualifications of its physicians by MESA TeamHealth, Plaintiffs suffered the damages outlined in this Complaint.

181. Plaintiffs also seek an award of punitive damages in an amount that will deter MESA TeamHealth from staffing the Emergency Department at a local hospital with physicians who are untrained, unqualified and ill-prepared to deal with patients like Elijah Allen Moore who's care could have been determined by a search on Dr. Ferguson's smart phone.

## COUNT SEVEN: CORPORATE NEGLIGENCE OF MESA TEAMHEALTH:

182. Plaintiffs re-allege each allegation contained in paragraphs 1-181 as if the same were reprinted herein.

183. MESA TeamHealth had a duty to operate the Emergency Department at the local hospital safely and responsibly so that the lives of its patients are never needlessly endangered.

184. MESA TeamHealth had a duty to develop and implement standards and protocols for the safe operation of the Emergency Department at a local hospital so that the lives of its patients are never needlessly endangered.

185. MESA TeamHealth had a duty to develop and follow policies and procedures to ensure the safe operation of the Emergency Department of a local hospital so that the lives of its patients are never needlessly endangered.

186. MESA TeamHealth had a duty to develop and implement policies, procedures and standards for treatment for patients in the Emergency Department at a local hospital so that the lives of its patients are never needlessly endangered.

41

187. MESA TeamHealth had a duty to operate the Emergency Department with sufficient staff, proper training, and staff development to ensure that professional medical services are rendered to patients in the Emergency Department at a local hospital so that the lives of its patients are never needlessly endangered.

188. MESA TeamHealth had a duty to provide the necessary medical equipment and supplies for the safe operation of the Emergency Department at a local hospital so that the lives of its patients are never needlessly endangered.

189. MESA TeamHealth had a duty to make certain it is providing services at a local hospital in accordance with standards of care in the field, safety and health regulations, treatment guidelines, and in compliance with all governmental rules and regulations applicable to them so that the lives of its patients are never needlessly endangered.

190. MESA TeamHealth had a duty to properly train, supervise and give direction to all members of the medical staff in the Emergency Department at a local hospital so that the lives of its patients are never needlessly endangered,

42

191. MESA TeamHealth had a duty to provide the highest quality medical care to patients at the Emergency Department at a local hospital, which includes complete, timely, and accurate physical and medical assessments; necessary and adequate evaluation, monitoring, treatment, and medication; necessary nursing supervision and patient monitoring; and timely physician, nursing and other medical intervention so the lives of its patients are never needlessly endangered.

192. MESA TeamHealth had a duty to adequately assess, evaluate, and supervise personnel in the Emergency Department at a local hospital to ensure that the lives of its patients are never needlessly endangered.

193. MESA TeamHealth had a duty to provide appropriate, safe, and proper medical services, in accordance with its own policies and procedures, JCAHO regulations, and the laws and regulations provided by the State of West Virginia for patients in the Emergency Department at a local hospital so the lives of its patients are never needlessly endangered.

194. MESA TeamHealth breached that duty when its physician provided care and treatment to Elijah Allen Moore, which was a proximate cause of the alleged injuries and damages in this Complaint, including the wrongful death of Elijah Allen Moore.

**COUNT EIGHT:  COMBINED NEGLIGENCE OF RICHARD A. FERGUSON, M.D. AND MESA TEAMHEALTH:**

195. All of the allegations contained in paragraphs 1-194 are restated herein.

196. Based upon West Virginia Code §55-7B-3, Plaintiffs may recover from the Defendants for their pain, suffering and mental anguish of their son, Elijah Allen Moore, for his pain, suffering and mental anguish of their son prior to his death, and for his wrongful death, if they can prove to a reasonable degree of medical probability that meeting the standard of care would have resulted in a greater than twenty five percent (25%) chance that their son would have survived the intracranial bleed.

197. The law does not provide any greater burden than the one imposed by West Virginia Code §55-7B-3, which Plaintiffs can prove to a reasonable degree of medical probability, based upon the medical evidence to be presented at a trial in this matter, that their son had a

44

greater than 25% chance of surviving the CNS bleed had he been treated upon admission to the ED by Dr. Ferguson.

198. Had Defendants met the applicable standard of care and provided proper assessments, monitoring, treatment, staffing, training and medical intervention, Elijah Allen Moore would have had at least a greater than twenty five percent (25%) chance of surviving his CNS bleed.

199. As a direct and proximate result of Defendants negligent and wrongful acts as described in this Complaint, Elijah Allen Moore sustained serious and painful injuries to his mind and body, prior to his death.

Wherefore, Plaintiffs demand judgment in an amount that will fairly compensate:

   a. Amethyst Dawn Kimble Moore for the injuries she has sustained.

   b. Timothy Allen Moore for the injuries he has sustained.

   c. Elijah Allen Moore for the injuries he sustained prior to his death.

   d. Estate of Elijah Allen Moore for the injuries it has sustained.

e. Amethyst Dawn Moore, Timothy Allen Moore, Elijah Allen Moore, and the Estate of Elijah Allen Moore they have sustained for which they are rightfully entitled to fair compensation as conscientiously and properly enumerated by the West Virginia legislature in West Virginia Code Section 55-7-6(c)) which compensation shall include, but may not be limited to, damages for the following: sorrow, mental anguish, and solace which may include society, companionship, comfort, guidance, kindly offices and advice of their son Elijah Allen Moore; compensation for any reasonably expected loss of income that he would have earned in his lifetime and services, protection, care and assistance that they would have received from Elijah during his expected lifetime.

f. Plaintiffs demand punitive damages against Defendant Ferguson in an amount that will keep him from needlessly delaying the care of his patients, like Elijah Allen Moore, which he needed in order to survive his CNS bleed.

46

g.  Plaintiffs demand punitive damages against Defendant
    Ferguson in an amount that will stop him from needlessly
    endangering the lives of patients at the local hospital.

h.  Plaintiffs by way of punitive damages against Defendant MESA
    TeamHealth in an amount that will stop them from
    endangering the lives of Plaintiffs like Elijah Allen Moore.

i.  Plaintiffs by way of punitive damages against Defendant MESA
    TeamHealth in an amount that will stop them from falsely
    advertising the stellar physicians they employ, when the same
    is clearly false.

j.  Plaintiffs demand a Jury Trial on all issues contained in its
    Complaint.

> Amethyst Dawn Kimble Moore,
> Timothy Allen Moore, and
> Amethyst Dawn Kimble, as
> Administratrix of the Estate of
> Elijah Allen Moore,
>
> Plaintiffs,
>
> By counsel,

47

David A. Sims (W.Va. Bar No. 5196)
LAW OFFICES OF DAVID A. SIMS, PLLC
P. O. Box 5349
Vienna, West Virginia 26105
(304)-428-5291
david.sims@mywvlawyer.com

# IN THE CIRCUIT COURT OF WOOD COUNTY, WEST VIRGINIA

Amethyst Dawn Kimble Moore,
Timothy Allen Moore,
Amethyst Dawn Kimble,
Administratrix of the Estate of
Elijah Allen Moore,

        Plaintiffs,

   v.                              Civil Action No. 15-C-203
                                       Judge: Robert Waters

Richard Ferguson, M.D.
And MESA of TeamHealth, Inc.,
A foreign corporation,

        Defendants.

## NOTICE OF WEST VIRGINIA CODE § 55-7B-6B STATUS CONFERENCE

Now Comes your Plaintiffs by and through their respective counsel and does hereby provide Notice that the Court has set this matter down for a Status Conference pursuant to West Virginia Code § 55-7B-6b to take place on the 13th day of May 2015 at 10:00 a.m. via telephone. Counsel for Plaintiffs shall provide notice to all counsel and to the Court the call-in instructions at least two weeks prior to the conference so that all may participate via telephone.

Amethyst Dawn Kimble Moore,
Timothy Allen Moore, and
Amethyst Dawn Kimble, as
Administratrix of the Estate of
Elijah Allen Moore,
Plaintiffs,

By counsel,

_David A. Sims_ (W.Va. Bar No. 5196)
LAW OFFICES OF DAVID A. SIMS, PLLC
P. O. Box 5349
Vienna, West Virginia 26105
(304)-428-5291
david.sims@mywvlawyer.com

2

# IN THE CIRCUIT COURT OF WOOD COUNTY, WEST VIRGINIA

Amethyst Dawn Kimble Moore,
Timothy Allen Moore,
Amethyst Dawn Kimble,
Administratrix of the Estate of
Elijah Allen Moore,

        Plaintiffs,

      v.

Richard Ferguson, M.D.
And MESA of TeamHealth, Inc.,
A foreign corporation,

        Defendants.

Civil Action No. 15-C-203
Judge: Robert Waters

## CERTIFICATE OF SERVICE

I, David A. Sims, as counsel for Plaintiffs do hereby certify that I served the

attached NOTICE OF WEST VIRGINIA CODE § 55-7B-6B STATUS CONFERENCE by

depositing a true copy in the United States Mail, postage prepaid, upon

counsel of record in this matter, addressed as follows:

        Tamela J. White, Esquire
        FARRELL, WHITE & LEGG, PLLC
        Post Office Box 6457
        Huntington, WV 25772-6457

1

Stephen S. Burchett, Esquire
OFFUTT, NORD & BURCHETT
949 Third Avenue
Huntington, WV  25728

Dated at Vienna, West Virginia on this 2nd day of April 2015.

David A. Sims (W.Va. Bar No. 5196)

LAW OFFICES OF DAVID A. SIMS, PLLC
P. O. Box 5349
Vienna, West Virginia 26105
(304)-428-5291
david.sims@mywvlawyer.com

2

## IN THE CIRCUIT COURT OF WOOD COUNTY, WEST VIRGINIA

Amethyst Dawn Kimble Moore,
Timothy Allen Moore,
Amethyst Dawn Kimble,
Administratrix of the Estate of
Elijah Allen Moore,

       Plaintiffs,

v.

                                      Civil Action No. 15-C-203
                                      Judge: Robert Waters

Richard Ferguson, M.D.
And MESA of TeamHealth, Inc.,
A foreign corporation,

       Defendants.

### PLAINTIFFS' CERTIFICATE OF FILING OF THEIR FIRST COMBINED DISCOVERY REQUESTS TO DEFENDANT RICHARD A. FERGUSON, M.D.

Pursuant to the General Order pertaining to dispensing with filing of discovery matter in all civil actions in the Circuit Court of Wood County, counsel of record for Plaintiffs does hereby certify that the Law Offices of David A. Sims, PLLC did, on the 13th day of March 2015, serve upon counsel of record the following:

**Plaintiffs' First Combined Discovery Requests to Defendant Richard A. Ferguson, M.D.**

1

This item was served by depositing a true copy in the United States Mail, postage prepaid, upon counsel of record in this matter. The originals have been retained in our possession, as per the above-referenced Order.

Amethyst Dawn Kimble Moore,
Timothy Allen Moore, and
Amethyst Dawn Kimble, as
Administratrix of the Estate of
Elijah Allen Moore,
Plaintiffs,

By counsel,

David A. Sims (W.Va. Bar No. 5196)

LAW OFFICES OF DAVID A. SIMS, PLLC
P. O. Box 5349
Vienna, West Virginia 26105
(304)-428-5291
david.sims@mywvlawyer.com

2

## IN THE CIRCUIT COURT OF WOOD COUNTY, WEST VIRGINIA

Amethyst Dawn Kimble Moore,
Timothy Allen Moore,
Amethyst Dawn Kimble,
Administratrix of the Estate of
Elijah Allen Moore,

       Plaintiffs,

    v.

                                      Civil Action No. 15-C-203
                                      Judge: Robert Waters

Richard Ferguson, M.D.
And MESA of TeamHealth, Inc.,
A foreign corporation,

       Defendants.

### CERTIFICATE OF SERVICE

I, David A. Sims, as counsel for Plaintiffs do hereby certify that I served the

attached item was served by depositing a true copy in the United States Mail,

postage prepaid, upon counsel of record in this matter, addressed as follows:

                    Tamela J. White, Esquire
                    FARRELL, WHITE & LEGG, PLLC
                    Post Office Box 6457
                    Huntington, WV 25772-6457

Dated at Elkins, West Virginia on this 16th day of March 2015.

1

David A. Sims (W.Va. Bar No. 5196)

LAW OFFICES OF DAVID A. SIMS, PLLC
P. O. Box 5349
Vienna, West Virginia 26105
(304)-428-5291
david.sims@mywvlawyer.com

2

## IN THE CIRCUIT COURT OF WOOD COUNTY, WEST VIRGINIA

Amethyst Dawn Kimble Moore,
Timothy Allen Moore,
Amethyst Dawn Kimble,
Administratrix of the Estate of
Elijah Allen Moore,

       Plaintiffs,

    v.
                                 Civil Action No. 15-C-203
                                 Judge: Robert Waters

Richard Ferguson, M.D.
And MESA of TeamHealth, Inc.,
A foreign corporation,

       Defendants.

### CERTIFICATE OF SERVICE

I, David A. Sims, as counsel for Plaintiffs do hereby certify that I served the

attached item was served by depositing a true copy in the United States Mail,

postage prepaid, upon counsel of record in this matter, addressed as follows:

> Tamela J. White, Esquire
> FARRELL, WHITE & LEGG, PLLC
> Post Office Box 6457
> Huntington, WV 25772-6457

Dated at Elkins, West Virginia on this 16th day of March 2015.

1

David A. Sims (W.Va. Bar No. 5196)

LAW OFFICES OF DAVID A. SIMS, PLLC
P. O. Box 5349
Vienna, West Virginia 26105
(304)-428-5291
david.sims@mywvlawyer.com

## IN THE CIRCUIT COURT OF WOOD COUNTY, WEST VIRGINIA

Amethyst Dawn Kimble Moore,
Timothy Allen Moore,
Amethyst Dawn Kimble,
Administratrix of the Estate of
Elijah Allen Moore,

       Plaintiffs,

    v.                                   Civil Action No. 15-C-203
                                           Judge: Robert Waters

Richard Ferguson, M.D.
And MESA of TeamHealth, Inc.,
A foreign corporation,

       Defendants.

### CERTIFICATE OF FILING

Pursuant to the General Order pertaining to dispensing with filing of discovery matter in all civil actions in the Circuit Court of Wood County, counsel of record for Plaintiffs does hereby certify that the Law Offices of David A. Sims, PLLC did, on the 19th day of March 2015, serve upon counsel of record the following:

NOTICE OF VIDEO DEPOSITION AND REQUEST FOR DOCUMENTS FOR RICHARD A. FERGUSON, M.D.

NOTICE OF VIDEO DEPOSITION AND REQUEST FOR DOCUMENTS FOR MESA TEAMHEALTH'S RULE 30(b)(7) REPRESENTATIVE(S).

This item was served by depositing a true copy in the United States Mail, postage prepaid, upon counsel of record in this matter. The originals have been retained in our possession, as per the above-referenced Order.

Amethyst Dawn Kimble Moore,
Timothy Allen Moore, and
Amethyst Dawn Kimble, as
Administratrix of the Estate of
Elijah Allen Moore,
Plaintiffs,

By counsel,

David A. Sims (W.Va. Bar No. 5196)

LAW OFFICES OF DAVID A. SIMS, PLLC
P. O. Box 5349
Vienna, West Virginia 26105
(304)-428-5291
david.sims@mywvlawyer.com

2

Apr. 9. 2015 12:54PM                                    No. 1535   P. 4

Office of the Secretary of State
Building 1 Suite 157-K
1900 Kanawha Blvd E.
Charleston, WV 25305



**Natalie E. Tennant**
Secretary Of State
State Of West Virginia
Phone: 304-558-6000
866-767-8683
Visit us online:
www.wvsos.com

Carole Jones
Wood Co. Judicial Bldg.,Rm.133
#2 Government Square
Parkersburg, WV 26101-5353

**Control Number:** 53958

**Defendant:** CORPORATION SERVICE COMPANY
209 WASHINGTON ST W
CHARLESTON, WV 25302-2348 US

**Agent:** Corporation Service Company

**County:** Wood

**Civil Action:** 15-C-203

**Certified Number:** 92148901125134100000578762

**Service Date:** 3/16/2015

I am enclosing:

**1 summons and complaint**

which was served on the Secretary at the State Capitol as your statutory attorney-in-fact. According to law, I have accepted service of process in the name and on behalf of your corporation.

*Please note that this office has no connection whatsoever with the enclosed documents other than to accept service of process in the name and on behalf of your corporation as your attorney-in-fact. Please address any questions about this document directly to the court or the plaintiff's attorney, shown in the enclosed paper, not to the Secretary of State's office.*

Sincerely,

*Natalie E Tennant*

Natalie E. Tennant
Secretary of State

RETURNED

**MAR 2 0 2015**

CAROLE JONES
CLERK CIRCUIT COURT

SUMMONS

IN THE CIRCUIT COURT OF WOOD COUNTY, WEST VIRGINIA


**AMETHYST DAWN KIMBLE, Administratrix**
Of the Estate of **ELIJAH ALLEN MOORE**,
**AMETHYST DAWN KIMBLE MOORE, and**
**TIMOTHY ALLEN MOORE**

                      Plaintiff(s)

VS:

                           Civil Action # **15-C-203**

**RICHARD A FERGUSON, MD**
and **MESA of TEAMHEALTH, INC.,**
**a foreign corporation**

                    Defendant(s)

To:        **Corporation Service Company**
             **209 W Washington Street**
             **Charleston WV 25302**


   IN THE NAME OF THE STATE OF WEST VIRGINIA, you are hereby summoned and required to serve upon **David A. Sims** whose address is: **PO Box 5349, Vienna, WV 26241** an answer including any related claim you may have, to the Complaint filed against you in the above styled civil action, a true copy of which is herewith delivered to you. You are required to serve your answer within **30 days** after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint and you will be thereafter barred from asserting in another action any claim you may have which must be asserted by counterclaim in the above styled civil action.

West Virginia Secretary of State
Invoice #25735
Date: 3/13/2015
LAW OFFICES OF DAVID A. SIMS PLLC

| Service | Qty | Sub |
|---|---|---|
| Service - US defendant 15-C-203 | 1 | $20.00 |
| Total | | $20.00 |

| Payment type | Amount |
|---|---|
| Check | $20.00 |
| Total | $20.00 |

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

MESA Team Health
Randal Dobbs, MD, President
265 Brookview Centre Way
Suite 400
Knoxville TN 37919

2. Article Number
   (Transfer from service label)
   7012 3460 0003 7791 8062

PS Form 3811, July 2013    Domestic Return Receipt

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent
                        ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
   Karen BATN              3/20/15

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No

RETURNED
MAR 20 2015
CAROLE JONES

3. Service Type
   ☐ Certified Mail®      ☐ Priority Mail Express™
   ☐ Registered          ☐ Return Receipt for Merchandise
   ☐ Insured Mail        ☐ Collect on Delivery

4. Restricted Delivery? (Extra Fee)   ☐ Yes

## In the Circuit Court of Wood County, West Virginia

Amethyst Dawn Kimble Moore,
Timothy Allen Moore,
Amethyst Dawn Kimble,
Administratrix of the Estate of
Elijah Allen Moore,

       Plaintiffs,

      v.                             Civil Action No. 15-C-203
                                     Judge: Robert Waters

Richard Ferguson, M.D.
And MESA of TeamHealth, Inc.,
A foreign corporation,

       Defendants.

---

# Subpoena Duces Tecum

---

To:   Camden Clark Medical Center         Thomas J. Hurney, Esquire
       800 Garfield Ave                   Jackson Kelly, PLLC
       Parkersburg, WV 26101           P.O. Box 553
       Attention: David McClure, CEO     Charleston, WV 25322

---

**You Are Hereby Commanded:**

To produce or permit inspection of and copying of the following designated documents:

1. A listing of all patients admitted to the Emergency Department on February 19, 2014, between the hours of 10:00 a.m. to 6:00 p.m. with any identifying information of any kind redacted. Plaintiffs are not requesting any identifying information whatsoever, but are

1

requesting that Camden Clark Medical Center provide the triage nurse's acuity level assigned to each patient on the list during the hours requested. Plaintiffs are also requesting that the list display the admission time for each patient and the discharge time for each patient. If desired by Camden Clark Medical Center, Plaintiffs will enter into a protective order agreeing not to disseminate any information from said list to anyone other than counsel for Defendants and their expert witnesses, if necessary, and will return or destroy said information at the close of the litigation; and,

2. A listing of all Camden Clark Medical Center employees who were assigned to and worked in the Emergency Department between the hours of 10:00 a.m. through 11:00 p.m., including their titles, e.g. unit clerk, registered nurse, licensed practical nurse, administrative personnel, etc. Plaintiffs are not requesting any other information other than their names, titles, if any, and their shift times. If desired by Camden Clark Medical Center, Plaintiffs will enter into a protective order agreeing not to disseminate any information from said list to anyone other than counsel for Defendants and their expert witnesses, if necessary, and will return or destroy said information at the close of the litigation.

| PLACE OF INSPECTION: | DATE OF INSPECTION: | TIME: |
|---|---|---|
| LAW OFFICES OF DAVID A. SIMS, PLLC<br>1100 9th Street, Unit I<br>Vienna, West Virginia 26105 | April 6, 2015 | 11:00 a.m. |

**Note:** You may forward the above-referenced documents by United States Mail to the Law Offices of David A. Sims, PLLC, P.O. Box 5349, Vienna, West Virginia 26105, by the above-specified date in lieu of appearance. Plaintiffs will reimburse Camden Clark Medical Center for the reasonable costs incurred in the production and mailing of the information requested herein.

2

Subpoena issued on the 22nd day of March 2015 by:

*s/David A. Sims*

David A. Sims (W.Va. Bar No. 5196)
LAW OFFICES OF DAVID A. SIMS, PLLC
P. O. Box 5349
Vienna, West Virginia 26105
(304)-428-5291
david.sims@mywvlawyer.com

## YOU HAVE CERTAIN RIGHTS REGARDING THE ISSUANCE OF THIS SUBPOENA DUCES TECUM, THEY ARE AS FOLLOWS:

**W.Va. R. Civ. P. 45(c).**  Place of the examination.- A deponent may be required to attend an examination only in the county in which the deponent resides or is employed or transacts business in person, or at such other convenient place as is fixed by an order of court.

**W. Va. R. Civ. P. 45(d).** Protection of persons subject to subpoenas:

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena.  The Court on behalf of which the subpoena was issued may enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings, and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(2)(B) Subject to paragraph (e)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or

3

before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises.  If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued.  If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production.  Such an order to compel production shall protect any person who is not a party or an officer of a party form significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it (I) fails to allow reasonable time for compliance; (ii) requires a person to travel for a deposition to a place other than the county in which that person resided or is employed or transacts business in person or at a place fixed by order of the court; (iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or (iv) subjects a person to undue burden.  (B) If a subpoena (I) requires disclosure of a trade secret or other confidential research development, or commercial information, or (ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

**W. Va. R. Civ. P. 45(e):** Duties in responding to subpoena. - (1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.  (2)  When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

4

## IN THE CIRCUIT COURT OF WOOD COUNTY, WEST VIRGINIA

Amethyst Dawn Kimble Moore,
Timothy Allen Moore,
Amethyst Dawn Kimble,
Administratrix of the Estate of
Elijah Allen Moore,

       Plaintiffs,

     v.                                 Civil Action No. 15-C-203
                                         Judge: Robert Waters

Richard Ferguson, M.D.
And MESA of TeamHealth, Inc.,
A foreign corporation,

       Defendants.

### CERTIFICATE OF SERVICE

I, David A. Sims, as counsel for Plaintiffs do hereby certify that I served the

attached **Subpoena Duces Tecum on Camden Clark Medical Center** served

by depositing a true copy in the United States Mail, postage prepaid, upon

counsel of record in this matter, addressed as follows:

                    Tamela J. White, Esquire
                    FARRELL, WHITE & LEGG, PLLC
                    Post Office Box 6457
                    Huntington, WV 25772-6457

Dated at Elkins, West Virginia on this 22nd day of March 2015.

*s/ David A. Sims*

_____

David A. Sims (W.Va. Bar No. 5196)

LAW OFFICES OF DAVID A. SIMS, PLLC
P. O. Box 5349
Vienna, West Virginia 26105
(304)-428-5291
david.sims@mywvlawyer.com

2

Apr. 9. 2015 12:54PM                                    No. 1535   P. 2

TO: Sheriff of Wood CO.

Please serve the following persons listed below. Make your return of service on this set
and return it to the Wood County Circuit Clerk's Office.

Thank You.

Civil Action 15-C-203

Amethyst Dawn Kimble, administratrix of the
Estate of Elijah Allen Moore,
Amethyst Dawn Kimble Moore and
Timothy Allen Moore

                                        Petitioner

VS: Summons &1

Richard A ferguson, MD and
MESA of Teamhelath, Inc. a Foreign Corporation
                    Respondent

_____

        SERVE:
Richard A Ferguson MD
800 Garfield Ave
Parkersburg WV 26101

                    Sheriff fee attached

STATE OF WEST VIRGINIA,        SUMMONS &            RETURNED
COUNTY OF WOOD, to wit:        COMPLAINT
                                      upon the      MAR 3 0 2015
Executed the within _____ by delivering
within named _Richard Ferguson_ his/her         CAROLE JONES
a true copy thereof to _Jennifer Moore_            CLERK CIRCUIT COURT
agent, in person, on the _27_ day of _Jan_ 20_15_
in Wood County, West Virginia.

              Sheriff, Wood County
              West Virginia

              By_____
                    Deputy                          MAR 3 0 2015

                                                    CAROLE JONES
                                                    CLERK CIRCUIT COURT

## In the Circuit Court of Wood County, West Virginia

Amethyst Dawn Kimble Moore,
Timothy Allen Moore,
Amethyst Dawn Kimble,
Administratrix of the Estate of
Elijah Allen Moore,

      Plaintiffs,

    v.

      Civil Action No. 15-C-203
      Judge: Robert Waters

Richard Ferguson, M.D.
And MESA of TeamHealth, Inc.,
A foreign corporation,

      Defendants.

### Certificate of Service

I, David A. Sims, as counsel for Plaintiffs do hereby certify that I served the

attached **Stipulation to File Responsive Pleadings** by depositing a true copy

in the United States Mail, postage prepaid, upon counsel of record in this

matter, addressed as follows:

         Tamela J. White, Esquire
         Farrell, White & Legg, PLLC
         Post Office Box 6457
         Huntington, WV 25772-6457

1

Stephen S. Burchett, Esquire
OFFUTT, NORD & BURCHETT
949 Third Avenue
Huntington, WV  25728


Dated at Vienna, West Virginia on this 2nd day of April 2015.



_David A. Sims (W.Va. Bar No. 5196)

LAW OFFICES OF DAVID A. SIMS, PLLC
P. O. Box 5349
Vienna, West Virginia 26105
(304)-428-5291
david.sims@mywvlawyer.com

2

## IN THE CIRCUIT COURT OF WOOD COUNTY, WEST VIRGINIA

Amethyst Dawn Kimble Moore,
Timothy Allen Moore,
Amethyst Dawn Kimble,
Administratrix of the Estate of
Elijah Allen Moore,

        Plaintiffs,

    v.

Civil Action No. 15-C-203
Judge: Robert Waters

Richard Ferguson, M.D.
And MESA of TeamHealth, Inc.,
A foreign corporation,

        Defendants.

### NOTICE OF WEST VIRGINIA CODE § 55-7B-6B STATUS CONFERENCE

Now Comes your Plaintiffs by and through their respective counsel and does hereby provide Notice that the Court has set this matter down for a Status Conference pursuant to West Virginia Code § 55-7B-6b to take place on the 13th day of May 2015 at 10:00 a.m. via telephone. Counsel for Plaintiffs shall provide notice to all counsel and to the Court the call-in instructions at least two weeks prior to the conference so that all may participate via telephone.

1

Amethyst Dawn Kimble Moore,
Timothy Allen Moore, and
Amethyst Dawn Kimble, as
Administratrix of the Estate of
Elijah Allen Moore,
Plaintiffs,

By counsel,

_____

David A. Sims (W.Va. Bar No. 5196)
LAW OFFICES OF DAVID A. SIMS, PLLC
P. O. Box 5349
Vienna, West Virginia 26105
(304)-428-5291
david.sims@mywvlawyer.com

2

## IN THE CIRCUIT COURT OF WOOD COUNTY, WEST VIRGINIA

Amethyst Dawn Kimble Moore,
Timothy Allen Moore,
Amethyst Dawn Kimble,
Administratrix of the Estate of
Elijah Allen Moore,

        Plaintiffs,

    v.

Civil Action No. 15-C-203
Judge: Robert Waters

Richard Ferguson, M.D.
And MESA of TeamHealth, Inc.,
A foreign corporation,

        Defendants.

### CERTIFICATE OF SERVICE

I, David A. Sims, as counsel for Plaintiffs do hereby certify that I served the

attached NOTICE OF WEST VIRGINIA CODE § 55-7B-6B STATUS CONFERENCE by

depositing a true copy in the United States Mail, postage prepaid, upon

counsel of record in this matter, addressed as follows:

        Tamela J. White, Esquire
        FARRELL, WHITE & LEGG, PLLC
        Post Office Box 6457
        Huntington, WV 25772-6457

1

Stephen S. Burchett, Esquire
OFFUTT, NORD & BURCHETT
949 Third Avenue
Huntington, WV  25728

Dated at Vienna, West Virginia on this 2nd day of April 2015.

David A. Sims (W.Va. Bar No. 5196)

LAW OFFICES OF DAVID A. SIMS, PLLC
P. O. Box 5349
Vienna, West Virginia 26105
(304)-428-5291
david.sims@mywvlawyer.com

2